The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention for the Court is now sitting. God save the United States and this Honorable Court. May it please the Court, Daniel Olivas on behalf of the Appellant Applied Underwriters Capture Risk Assurance. Your Honors, this is the second appeal in this lawsuit where the underlying dispute is about a contract that the parties have between them. It's called the Reinsurance Participation Agreement. Please just go ahead. I'm listening really hard. We shorten that to the RPA. This part of the dispute is about whether the parties should arbitrate their claims. And that was the matter in the first appeal. And after the first appeal, this Court remanded the case to the District Court to consider whether the RPA constitutes an insurance contract for the purposes of Section 38.2312 of Virginia's Insurance Code. And that section prohibits arbitration agreements in insurance contracts in actions against the insurer. The District Court found that the RPA was an insurance contract and denied ACRA's motion to compel arbitration. ACRA has appealed and here we are. Now, since the papers cover the background pretty well, I'd like to focus on just one thing. And that's this, that the District Court didn't identify any definition of insurance contract that the RPA meets. The Virginia Insurance Code doesn't define the term insurance contract, but it does define the word insurance. And the District Court, however, didn't find that the RPA met the statutory definition of insurance. Instead, the District Court focused on the overall nature of the transaction and that an insurance traction was enough. It had to say this about looking only at the RPA, and I'm quoting now, ACRA's position, my client, ACRA's position rests entirely on parsing this transaction to the point of being completely disassociated with the realities of the overall transaction. ACRA contends that that's an error and that parsing the transaction was exactly what was supposed to happen here because the question under 38.2312 is whether the RPA itself is an insurance contract under the statute. The RPA must be insurance as defined by the statute. Why is it not just an endorsement or modification of the policy? Well, Your Honor, the provision at issue which prohibits an arbitration clause in an insurance contract doesn't look at that. It looks whether there is an actual insurance contract itself. Other states have that standard. That's true. California, for example. But the Virginia Insurance Code doesn't require that. It requires there be an insurance contract. And to be an insurance contract, there has to be insurance. But the RPA doesn't meet that definition. The RPA doesn't transfer any risk from Miniland, and the District Court didn't find that it did to the extent that there's indemnity in the RPA. The person the RPA indemnifies is ACRA, not Miniland. Does the RPA set forth the calculation of the premium? Not exactly, Your Honor. What it does is it calculates what happens to the premium that's paid to the guaranteed work cost policy insurer. It doesn't charge any premiums itself. It simply calculates what happens to the premium that Miniland pays to the insurer. But you maintain this is not an endorsement of the contract? We maintain that this isn't an insurance contract under Virginia law, Your Honor. Is it an endorsement of the contract? Well, that I don't know. California said it was. That wasn't a question in our case here under Virginia law, so I don't know the answer to that under Virginia law. Well, under Virginia law, isn't an endorsement part of the insurance contract? I think that would be, well, let me say it this way. That would be my understanding of But as I said, the question here is whether this is an insurance contract itself, whether this contract, this discrete contract, conforms to the definition of insurance, whether it transfers risk. And as I said, to the extent there's any indemnity under the RPA, the RPA indemnifies my client, not Miniland. And the district court didn't find otherwise. As regards payouts, which you would expect in an insurance contract, the only payment the RPA might make is that Miniland might get some money back if its claims were low, but the RPA doesn't guarantee any money back. So is it your position that an insurance contract under Virginia law is an insurance policy? Well, I don't think so. I think the term insurance contract refers to a larger panel of contracts than an insurance policy. I think that's true. So no, the answer is I don't think it has to be just an insurance policy. But it has to have insurance in it. And there's no insurance in the RPA. It doesn't insure against any covered casualty occurrence, any covered peril. And so it can't be insurance under the code as the code defines it. What was interesting, as I recall from the previous case, the purpose of this even in the patent application was to circumvent Virginia laws. And that is in terms of the insurance that Virginia allows for this. And so why should we interpret this as an insurance, this term insurance contract, in a way that would allow companies to circumvent Virginia laws? Well, let me push back just a little bit on that, Your Honor. I don't think the patent specified any particular law in what... It was sort of set up. It was set up in a way, the purpose of setting that up, it applied under what right was to circumvent laws, the state law. I thought it was Virginia law. It may have been the state law. Well, I think what the patent said was, this was a way of offering a pricing program that didn't fall under insurance regulations as they existed, at least at that time. And it wasn't my client's patent, Your Honor. It's the parent company. It applied under Rider's Inc.'s patent. But Virginia law doesn't allow this retroactive type rating to be done. And wasn't this the purpose of this, to get around that law? Well, the patent describes a non-linear retrospective plan. Even aside from the patent, isn't that the purpose of this, is to circumvent Virginia law that prohibits these type of contract? Well, no, I don't think the purpose was to circumvent law. I think the idea was, the purpose was to invent an insurance product that would allow small to mid-sized businesses an opportunity to maybe get some money back at the end of the contract if they kept their claims low, which is why I think Manyland took the deal. Well, Virginia kind of had a law like that, too. And that was why they set that retroactive prohibition up, was because if you use that instead of a guaranteed method, you're going to have just what happened here. And that is, you're going to have an insurance worker's compensation policy that might be one price, and then it might increase 1,000%, which is what happened here. And isn't that exactly what Virginia was trying to keep from happening? Well, I don't know what Virginia was trying to keep from happening, and I'm not trying to be disrespectful. I simply don't know the answer to that question. If that might help, did you hear what you just said, Mr. Liebers? You said that we're trying to provide an insurance product. Those are your words. That's correct, Your Honor. So you agree this is an insurance product? Yes, I do. But it's not an insurance contract. The specific contract is not. No, the policy would be an insurance contract. But you don't think the RFA is a part of the product? Well, I do think it's part of the product. But I think as a stand-alone contract, which is what the statute's looking for, I don't think it's an insurance contract. It doesn't do what insurance contracts do. Aren't you really facilitating partial self-insurance? Well, some courts have described it that way. I won't argue that that's been a discussion for a while. But that's pretty much what you're doing. Basically, they saw a partnering in their own insurance in the sense that they put up money, but subject to the return, if things look well and things go well, there's not a lot of payout, right? You're facilitating self-insurance. Well, let's assume that that's exactly correct. That still makes it non-insurance. The RPA part isn't insurance. Under that formulation, it would be almost the exact opposite of insurance. There wouldn't be any risk transfer. It's an over-under deal where you invest in your ability to keep your claims. That makes it non-insurance under the Virginia statute. Could Miniland have received the RPA with Acura? Was it required to sign the RPA to do that? That can be answered yes or no. The answer is yes. Yes, okay. It does so under the program as part of the program. But yes, that is true. You don't get the program without signing the RPA. But to your point, Judge Gregory, the only thing that matters here is whether the RPA is an insurance contract itself. Under that formulation, as you've just described it, it wouldn't be insurance. And that's our whole point, is that the statute only prohibits arbitration contracts in insurance contracts. So we're looking here to see whether there's an insurance contract. The code defines the term insurance and the RPA doesn't meet that. Yes, but in answer to my question, since you've conceded correctly that you can't have one without the other, then how can we say that they are separable from each other? Well, for purposes of what is an insurance policy, it just doesn't work. Well, if you can't have this insurance policy without signing with this, then that's all she wrote. It's part of the insurance policy. No matter how many times you talk about and Well, for the purpose of an insurance transaction, I think that's true. I think as an insurance transaction, they're part and parcel of each other. But when you start looking at the specific contracts, there are three different contracts with three different entities involved in this insurance transaction. I mean, the corporate separateness doctrines don't disappear because it's an insurance transaction. Well, I think it's a fiction and you want to say it's an investment. But as Judge Martz is pointing out, these things are all intertwined and you have this whole equity comp program. Why is that equity comp program itself? It's not just insurance contracts. Because you can't go straight to Continental and get this guaranteed policy that the law says is legal. So, you create this fictional type arrangement to avoid being classified in the retroactive rating workers compensation insurance. And allow this entity to get a lower cost policy, which you could get on a retroactive one. And then the result of what the Virginia law doesn't want to happen doesn't in fact happen. So, why is it not all together? How do we parcel out each one of these contracts when, as Judge Martz pointed out, you at least responded. You've got to have it or you won't get Continental to give you this guaranteed policy. My time has expired. May I answer that or should I do it? The thing is that the statute is looking for an insurance contract and there are three contracts and only one of them has an arbitration clause in it. Does any court agree with you on what you are arguing today? I don't know of any case in any state that has a similar statute to Virginia's where you look for an insurance contract that has the term insurance defined. There are states that prohibit retroactive rating workers compensation in the same manner as Virginia, aren't there? There may be, Your Honor. Has this happened and I've attempted to do the same thing there? I mean, obviously, you didn't patent this just for Virginia. No, Your Honor. So, my question is, has any other court agreed with you? I don't know that any other court has been faced with this question, but the question about retroactive... Have they agreed with you on any of these questions? There's been... It's been unfavorable in certain states, Your Honor. It's been almost uniformly unfavorable, correct? On issues pertaining to those states' insurance laws, yes. That's right. Thank you, Your Honor. Thank you so much. My name is Scott Krine. I have the privilege of representing Minneland Private Day School in this appeal. The first question is, the patent that they filed is designed to circumvent all state regulatory authorities. That's the purpose of it, and you read it... It's not illegal to... It's like taxes, right? It's called tax avoidance versus tax evasion. Structuring. They're making it legal to structure something to purposefully, legally so. It is... Intent is really of no moment, really, isn't it? You know, and that is what the law is. It's statutory law, right? That's correct, Judge Gregory. That's exactly right. And I noticed on the reply brief, they say, you know, intent is not relevant. What's interesting here is the effect of the RPA matches their intent. It is relatively brazen to read that patent and see what they said that they were doing. We are patenting this document, this RPA that they have here. We're going to patent this. And the purpose is to provide retrospective rating plans without getting approval of the state regulatory authorities. They say it's difficult to get approval for rating plans. So that is the purpose. So their intent... Minneland's not so clean in this either. I mean, you knew that when you went to get it. You knew the law. You didn't want to go with the guaranteed one. And so you went after an avenue that you felt you could get the benefit of something that the law didn't allow. Well, what Minneland understood is an issue I can't address here. What I can say is Minneland, nor anyone else, could enter into a contract that violated 38.2312. And I have no dispute on that. I'm just saying that when you present it as though the other party is doing something, trying to pull the wool over your eyes, they didn't pull in the wool over your eyes. You knew this too. Oh, well... There's liability for it is another question. But I'm just saying in terms of the policy aspect of it, it's not like you weren't trying, your client wasn't trying to achieve a benefit that otherwise it couldn't get. I can't answer that, Your Honor. That could be. I mean, that could be. I don't know. It also could be my client did not understand the product that they purchased, as every other court has found, and as the Insurance Commission of Vermont has found, as the Department of Insurance of Wisconsin found, as the Insurance Commission of California found when they reviewed this, barred this product from being sold, and ordered them to remit funds above the guaranteed cost policies to those policyholders. So I'm not being coy, Your Honor, Judge Winn. I just can't answer that. What my client knew, it is just as likely they didn't know because they didn't understand. Well, you could have asked your client. But what you're doing is wrapping yourself around what this transaction is. Yes, ma'am. All right. Yes, ma'am. I would stick with that for you rather than whether you knew or didn't know. Well, the question was asked of me, and I don't know. What I would say is, Your Honor, it's interesting that Applied could come in and talk about intent and what this document does. There's no question that the RPA was the instrument. In the hobbit world, it's the one ring that ruled them all. You could not get this insurance. They sold it. You could not get it. Everything was subject to this RPA. If you read the RPA, it absolutely modifies. In the terms of the California Insurance Regulator, it supplants the terms of the insurance policy. One simple example I will give to you is the termination fees. From the day this insurance was- How do we deal with the law and the statute? The question is, what is an insurance contract? Correct? Correct. So that would be an agreement to insure something or someone. Correct. And insuring is underwriting risk. Correct? Correct. What risk did the RPA allocate to itself, the entity? To the insurers? To provide the insurance coverage to Miniland. The risk. The risk was Miniland's obligation to have insurance under the statute. As an employer, they are required to have insurance. This product is sold as- Who bore that risk? Excuse me? Who bore the risk? What entity? Entity. Entity. Applied underwriters who sold this product. Under this RPA, they are to provide a policy, but the policy- What do they pay? What do they pay? What does applied pay? Yes. No, they get the benefits. No, but people- They have no- Wait a minute, counsel. You said they took risk. So what risk did they take that they had to pay something? That workers are injured and those benefits have to be- And who would pay? They would pay? They do have to pay. Under their- If you read- You can go back, actually. This is another interesting part. If you read their agreement with their insurance companies, they have authority over reserves. This entity. Their insurance companies. Their insurance companies, right. Continental Insurance Company is here. They own that. California Insurance Company, they own that. Pennsylvania Insurance Company, they own that. This RPA said one of our affiliates will issue a policy. Many land didn't know. They could have picked any one of these policies. The RPA gives this entity, applied underwriters, the authority to pick an entity to- And because they're connected with insurance companies, that makes the RPA an insurance contract. That's your logic? They own them. It's an insurance contract to provide insurance coverage. No, I'm saying you gave us the litany of other companies to whom they're affiliated. I'm asking you, because of their affiliation with insurance companies, that's what makes the RPA an insurance contract. Is that your logic? It's a very specific question, so don't go around it. Answer it like a Lickelian geometry, linear. Is that the basis of your logic of saying this is an insurance contract because they're affiliated with insurance companies? Yes or no? Yes. All right. Good. Go ahead, man. You can go ahead and argue your case. Yes. It is also an insurance contract further because they were obligated- So that's not the only reason? No. No. But the answer is- What was the other reason? And there would risk, now, that they pay. They pay. Yes, because they have contracted to provide insurance coverage, as they call it, a program. They talk about this RPA being one component of this program. Well, the program is insurance, and our statute defines not a policy. A policy, under the law, is a kind of contract. I mean, the PBM Pharmaceuticals or Nutritional- I thought CNI was the company that paid for losses and costs. I must be reading it wrong. No. CNI is a licensed workers' comp insurance company with the State of Virginia. They issued a guaranteed cost policy. The form of that policy has been approved by Virginia. The rates that it says have been approved by Virginia. This RPA imposes-see, you're talking about premiums. Every time I talk to you about risk, you shift to premiums. I'm asking you, who has the risk of paying when there are claims? Who? What entity? This entity, Applied Underwriters, has that risk. Doesn't CNI have that risk? That's who Applied Underwriters chose to issue a policy. I don't care. They chose them, but they chose them. They have the risk. Correct. Continental Indemnity has that risk. Right. So does Applied Underwriters, because they contracted to provide the coverage to this insured miniland, every insured. So you're telling me that if CNI didn't pay a claim, they would have to pay? Sure. Okay. They would have to pay out of their pocket. That's who this insured would sue. You would sue? The insured would sue the entity that it contracted with, Applied Underwriters. This statute, if you look at the definition of insurance, 38.2100, insurance is defined in there, and it says it's coverage. It doesn't say necessarily a policy. I suppose you could do it under any kind of a contract, but a policy is a contract. This RPA completely supplants the terms of the policy. And my point is, Your Honor, if I can get to this, on December 16, 2015, Miniland's insurance was terminated. It was terminated. Its insurance coverage was terminated. And the reason given for that termination was nonpayment of premium. At that time, Miniland had already paid 20% over the state-approved rate for its insurance coverage. Already paid 28% over. In the notice it said, We are terminating your coverage for nonpayment of premium. Applied Underwriters didn't state the amount of the nonpayment of premium because they couldn't, because they were charging them retrospectively. As it turns out, we file this case, we get a demand for arbitration, they want another $347,000. That is 46%. So now we're looking at what is nominally an approved workers' compensation insurance coverage, what is approved workers' compensation insurance, supposedly, but it has been terminated for failure to pay 26% over, now 46% over, the state-approved rate. And the RPA completely changes the terms of what they are pretending is the state-approved coverage. The termination fees, Your Honor, when this is terminated under the RPA, they owe not only the short-rate termination fees that are under our state-approved policy, this says right here, You pay us, not Continental. If this policy is terminated, you pay us, Applied Underwriters, not Continental Insurance, the amount of the money due under the policies, plus 8%, plus other fees. So they terminated this insurance, excuse me, and the remaining costs are owed under the RPA, not to Continental Insurance Company, but to them. So to go back to your question, yes, Applied is the entity that is abhorring the risk, it's also the entity that is getting the funds. And it has completely changed the terms of our state policy. Well, you've done a great job explaining how the policy is not really good, not favorable to your client, but I'm not sure you've explained that they take the risk. They tell me it's a rate problem, it's too much, premiums are too high, I don't like those kind of things. What did you say? It's more than that. What did you say? You said it's a rate problem. What did you just say? I thought you said that the rate was too high. I thought you said something. Go ahead. I'm sorry, Judge Gregory. Go ahead. You're exactly right. It's not that it's more than the policy, that the cost was too high, it's that they imposed a rate plan that is not approved by this state. And that's what it does. And beyond definitional terms in the statute, Judge Gregory, it's just looking at it, this is what it does. And so the point I was making is the money goes to them, they do have the risk, it's their affiliated companies. They say that right in the documents. And it's one unified plan, Your Honor. It's one unified plan. Now, California changed their laws, didn't they? Deal with this a little bit? No, they barred, California barred them from selling this recently and they have entered into a settlement agreement where this company has changed their business practices. California didn't change its laws, they changed their business practices. I apologize tremendously, Judge Gregory. You made me laugh if I said anything. No, go ahead. That's fine. And that's it. The bottom line is that this document, this RPA that they have, just like an endorsement like every other state has found, an endorsement or a rider, it's a contract because it amends the policy that they issue. The policy is just part of it. It's as seamless as they sell it, a one unified program of insurance. Essentially applied underwriter's re-insurer's continental. Yes, that's what they would say. But they have their own – the instruments are very interesting and they're in the record and the trial court has them, all of these agreements that they have with them are more interesting. Before the trial court, on remand, they tried to say, oh, applied underwriter's doesn't have anything to do with the insurance policy, and that's just not true. You can see the briefs where they have the right to set the reserves. So they're actually intimately involved in the administration, in the claims administration. And so in terms of risk, Judge Gregory, all of them and their affiliates are all in it together. So what I was going to close with is what I wanted to show you. If there's any doubt that this RPA doesn't have – isn't a driver of this insurance coverage that is provided to insureds, many land or anyone else, all you need to look at is the fact that the terms of the RPA and the program that they impose. They impose a three-year term. Our state approved policies are only for one year. You've got a guaranteed rate, says it right on the front. And this RPA is what drives it. It's what – they canceled it for these premiums. And if you look at the costs and the premiums that they charge, you can see that it applies to policy payroll. And in terms of our definitions, rates are anything imposed by any contract for the procurement or the acquisition or the administration of insurance coverage. What they want to do is say that this is not a policy, therefore by definition it's not insurance. That's just not true. That's as if to say a formal approved endorsement to a form or a rider on a form are approved, of course, once they're submitted. The fact that this wasn't submitted, it's still an insurance contract. And in this case they use – it's interesting, they actually use our state approved guaranteed policies as a figure. When, in fact, they're imposing retrospective rating plans. That insurance policy you had, C&I, was a one-year contract? In here? I'm sorry. Was it a one-year contract? Yes, sir, there were three of them. But the RPA was a three-year contract. Correct. It required a three-year term. That's why when they terminated it early. But doesn't that auger against your argument that it wasn't even matched in terms of temporal match? You know you had to do something. There was an obligation that was two years beyond your insurance contract, correct, with C&I? No, the insurance contract is with applied underwriters. They could not get a policy without entering into – subject to this RPA. The RPA said policies will be issued by one of their affiliates. But you had to sign this. This is the foundational document of this program. But if you signed a three-year contract, but you didn't have a contract beyond the one year that you had with C&I, what would be the responsibility of your client for the next two years under the RPI? Applied would sue them for breach of the insurance contract because it has a three-year term. A breach of a contract that's ended. You said a one-year term, right? The state-approved policies – our state-approved workers' comp policies exist for one year. Right. So under the RPA, this insurance coverage was obligated to last for three years. But they had to employ – they employed state-guaranteed policies, telling Virginia, oh, this is the policy. This is the insurance coverage that ManyLand has. And they would show them a one-year policy. But that wasn't it. They were obligated to pay this three-year program as set out in this RPA. Well, isn't there some state enforcement we hear grappling with what is a contract – contract of insurance that Virginia has chosen, there's wisdom not to define that as a matter of statute, that perhaps it is in the regulatory that all the things you – the calamities you talked about is for redresses with the state, that this is illegal. This is not – it's not appropriate. And, therefore, it must be redressed in the scheme of state remedies, wouldn't it be? I mean, I'm just asking you, the client. No. I mean, Vermont – the Vermont regulatory authorities did that. The Wisconsin regulatory authorities did that. The California regulatory authorities did that. I am sure that the Virginia – Has anyone tried with Virginia? Did you know? Did your client try with Virginia to say, look, look at what they've done here. This doesn't mirror what you – Well, events have superseded. They were – their policy was canceled early on December 16, 2015. They had no choice. They had to find another insurer to provide them workers' compensation insurance coverage, which they have to have. So events have superseded that. That would bar them then from going to the state corporation commission insurance to do that? No. To redress that? No. Many Land is pursuing its remedies in this court, which it – Oh, I know that. That's why we're here today. But I'm saying in terms of the fact that Virginia has not laid that out from a statutory standpoint, then perhaps that would suggest perhaps that the remedy lies in the regulatory scheme of a state corporation commission. The workers' – the Virginia workers' insurance commission could take this insurance company to task. So could the SEC, absolutely. Right. Okay. So there are some remedies, state remedies, do you think? State remedies. I believe that – yes. Yes. There are regulatory remedies for a violation of the statute, yes. Thank you. Thank you, counsel. Delilah, you have some time. Thank you once again, Your Honors.  Have you ever – can we just pick up on where Judge Gregory was? Certainly. Have you ever contended that they should be before some sort of state agency, that their remedies lie there, and pointed out to them what their remedies might be? We have not, Your Honor. This has all been a dispute over whether we can arbitrate or not. We haven't. Exactly. Yes. I'm afraid we haven't got that far. My client – Why wouldn't your client test that with the state? Given, as you already admitted since you brought it up, that your record scorecard had been that good around the country, wouldn't you want to test this with the regulatory and see what this is before we roll it out here to the United States Court of Appeals for the Fourth Circuit? I always think it's kind of strange that people who run businesses want courts to decide what their business. That's the last thing I want as a business person, someone who knows nothing about my business, because they went to law school and they're judges, to decide. Why wouldn't you go to the people who are the experts and deal with this and see what they say? Well, I think my client's kind of taken a species of that. We've tried to arbitrate this. Going to the regulatory authority and kind of petitioning the Virginia Insurance Commission has not been something I've talked about with my client. I'll say that. But we've tried to do a species of that and get us into arbitration. We see the problem. You hear it now, as I think Judge Mott and I think Judge Wynn as well, there are questions to you that you look so much like insurance. At some point it's raining and you're floating and you're quacking. There's going to be some conclusion that you might be a duck. Well, I think sometimes that's pretty apt. But in this case, Your Honor, the statute says there must be an insurance contract in order to prohibit arbitration, and that's what we're here to look for. And I think in the three contracts that are all in the same transaction, I don't think this one is insurance. I think the policies are, but I don't think this is. So was your good colleague right when he was citing the preamblatory language about this is to facilitate getting, not getting around, but making sure these things can take a while by putting together this device, I would say, that does that. And in some way, Judge Wynn's question, does it frustrate the seeming statutory intent of Virginia to protect its citizens in the insurance contract? Well, from knowing what the statute is, I don't know the answer to that question. My instinct is that, no, this was unlawful. I don't think it's unlawful. No, no, no. That wasn't the judge's question to you, though. Maybe I didn't answer it. Your representation to us is there's nothing in any of these documents of yours, of any of your many allied companies, that says that there's any suggestion that they are avoiding state statutes that would forbid something. There's nothing in it. So I can be reading my joint appendix, and I'm not going to find anything. I can't find it right this second. I'm not going to be able to find that, right? That's your representation to us. Right. I don't believe there are any. Now, the patent is in the record. The patent says the patent says, and I'm paraphrasing now, but that because of insurance commission's unfamiliarity with new pricing schemes or something like that, this is designed to be a nonlinear, offer nonlinear retro pricing. Now, I don't know the distinction between linear and nonlinear. I have to say, look, this is your client. This is your case. You're here in the Fourth Circuit, and you all keep telling us you don't know things. I mean, you're supposed to be the experts on this record and on this law that controls here. You're supposed to be helping us. No, that's true, Your Honor, and I apologize if I'm overall unhelpful, but we had a very narrow issue in front of us. The issue was could we arbitrate or not originally, and now it's become whether there's an insurance contract in front of us, and I think on those ‑‑ So you would acknowledge that it can't be arbitrated under state law if it is an insurance contract, right? Yes, that's correct. So it doesn't seem to me that those issues are so very far apart. Well ‑‑ I mean, your very narrow issue is right there intertwined with this other issue. Let me say this. If it was true that the overall package is an insurance ‑‑ is a retro insurance policy that would be forbidden by Virginia law, I see that as separate from the question about whether there's one of three contracts is an actual insurance contract. The overall program may not pass muster, and I'm not saying it does or doesn't, but our question was does this one contract shift risk, and I think the answer is no, and I don't think the district court found that it did either. The district court took the overall transaction approach and said it's an insurance transaction, so that was enough, but I think that was an error. The statute says what it says. The legislature could have put something else in there, but it didn't, and so on that narrow question, I don't think Miniland has carried its burden to show that this isn't arbitrable, and we think the district court erred. But you see, the thing is that I like geometry, but when you say things like it's a non‑linear, that suggests that it's a curve go around, right? I mean, so what is it curving? What is it bending in terms of to facilitate the problem with these people who don't understand these new products like commissions, insurance commissions? That's what it says. How is it smarter than and how is it implemented that it's not getting so close that it becomes perhaps insurance? Tell me why. Your time is almost finished. Tell me what's your best argument that this is not insurance, even though it is non‑linear, it's a little different, it's patent, it's unique. Why is that? How is that? Why? Well, because this part of the transaction doesn't transfer any risk. That's already occurred with the policies that the insurer signed, agreed to with Miniland. That's why this isn't insurance. There isn't insurance as defined by the statute. And so without that, you can't have an insurance contract. You may have an insurance transaction, but you don't have an insurance contract as to this particular piece. My time is done. Thank you, Your Honors. All right, thank you. We'll come down and get counsel and proceed to our next case.
judges: Roger L. Gregory, Diana Gribbon Motz, James A. Wynn Jr.